May it please the Court, my name is Lisa Davis and I'm honored to argue on behalf of the Appellant Hospitals, each of which is entitled to additional funding under the Medicare DISH statute based on their treatment of Arizona's low-income Medicaid populations. I'd like to reserve three minutes of my time for rebuttal. This Court's review is de novo. The Medicaid low-income proxy of the DISH statute, which is set forth at page 6 of the brief, requires inclusion of all low-income populations approved in a state plan and not just traditional or categorically eligible populations identified in Title 19. This Court has decided that demonstration waivers are state plans under Title 19, and since 1982, Arizona has operated its Medicaid state plan under a demonstration waiver. This demonstration waiver clearly included and depended on inclusion of these disputed MNMI, ELIC, and EAC populations, and today we're going to refer to those just as the MNMI populations. Now, did they have to be entitled to Medicaid? That's an interesting question, Your Honor. I think it's a critical question. It is. And they needed to be eligible for medical assistance under a state plan. And if you look to the language that Congress uses to describe medical assistance throughout Title 19, you will notice that Congress never defines Medicaid. It's a term of art that's thrown about. It's an insidious term, essentially, that suggests that Federal financial participation is required for a population to be eligible to be counted under the Medicare DISH statute. What the Medicare DISH statute requires is eligible for medical assistance under a state plan approved under Title 19. And what this Court has held in the Portland case is that to be included in the Medicare DISH statute, two things need to happen, and I'm quoting. Eligible for medical assistance under a state plan refers to persons described in the state plan and to who are receiving services by virtue of the plan. If you look at evidence submitted in the trial court below, and if you look to the plain language of Arizona's 1982 state plan waiver submission, the disputed populations were clearly described as being eligible for the state plan, and the Secretary clearly approved the state plan as submitted without any change or amendment to it. What do you mean the Secretary approved the state plan? The Secretary approved a number of waivers. Did the Secretary pass on the plan as a whole? The waiver is indistinguishable from the state plan. And we have testimony at the PRRB level from Dr. Linda Huff-Redmond, who was the Deputy Director of Access, that describes that the state plan in a state is the waiver application, the traditional check-the-box form that HCFA at the time, CMS now publishes for a traditional Medicaid state plan, and the Secretary's approval letter. And what the Secretary approved in 1982 were the waiver application and the traditional check-the-box formula. And the waiver that was approved related to these eligibility categories that are disputed in this case. And as I've examined the documents here, I did not emerge with the impression that any of the specific waivers that were the subject of the Secretary's or the Administrator's letter spoke to the issue of including additional populations in the state plan. Okay. Your Honor, that question assumes that federal financial participation is required for a population to be included in a waiver. Well, why does the federal government care about the state's inclusion of additional people that isn't out of the federal fisc? I mean, no waiver is required for the state to pay more for additional people. So it seems to me that maybe my understanding is correct, that Portland is different because Portland includes the federal government's approval of additional people being covered by the plan, at least in part covered by the federal government in terms of paying the bills. The additional people that come into the plan in Arizona apparently do not pose a financial burden to the federal government. And as I look at the waivers, I don't see anything there that suggests that the federal government passed on the question of whether additional people should be within the plan or not, because it wasn't their dollar. They didn't care. Am I wrong about my impression? Well, Your Honor, if you look at the Secretary's waiver approval letter, there are two textual references that relate directly to these disputed populations. The first reference that I would point you to is if you look at the excerpts of record, page 160, which is Arizona's waiver application, under the heading eligibility categories and benefits for access, Arizona discloses to the Secretary that the MNMI, these disputed populations, will be eligible, but they will have to pay up to 10 percent of the cost of their care, which has to do with the nominal copayment requirements. And in the Secretary's approval letter, excerpt of record, page 165, waiver number six, the Secretary granted that request to enable the states to impose cost sharing on mandatory services. Now, what's interesting about that is that under, on page 160 of the excerpts of record, that's the portion where Arizona describes all of the eligibility categories that are going to be covered in its state plan, and with respect to the other eligibility categories, the categorically eligible categories, cost sharing is not mentioned as something that will be applied. A second textual reference, if you look at the excerpts of record, page 158, again, Arizona's waiver application, the state discloses to the Secretary that, quote, a waiver will be necessary to allow non-federal costs to be paid by a mix of state and county funds, and this mix is otherwise not predicted or called for under Title 19. Now, what's interesting about Arizona's plan, and Arizona is different from every other waiver in the country, we were the first state to request a waiver and to receive one, is that Arizona, all of these populations, this bears emphasis that we're arguing about, could have been made eligible for traditional Title 19 Medicaid. Arizona could have simply filled out the check-the-box form and included all of these populations. It elected not to, so it could operate the managed care program. Now, counsel, apparently these people were not eligible for Medicaid. Is that correct? They were not eligible for federal financial participation under Title 19, but they were part of Arizona's approved state plan by virtue of the 1115 waiver, which this court has already decided that populations included in a state plan by virtue of an 1115 waiver are eligible for medical assistance under Title 19. And therefore must be counted in the Medicare DISH low-income proxy. I take it you're referring to Portland. Correct. Portland speaks specifically about the group that became eligible for services paid for with Medicaid funds by reason of the waiver. And I don't see anything in the Arizona plan that fits that category. Well, back to the specific textual references that I was covering before. So on page 158 of the excerpts, Arizona explained that, you know, we need this waiver so the county can contribute to the costs, because Title 19 doesn't envision that counties will participate. And Arizona had historically provided its, you know, charity care and health care to low-income residents on a county-by-county basis. Arizona came up with ACCESS as a statewide approach to provide comprehensive health care to its low-income populations, as described in the waiver application letter to the secretary. In the secretary's approval, on the excerpts page 165, if you look at waiver number 12, the secretary granted the state the ability to draw funds from the county to subsidize its health plan. And the fact that these county funds were only going to be applied to these disputed populations, it proves the point that the secretary understood that these populations were going to be included as part of the plan, and that the secretary approved that, because why else would he waive a portion of Title 19 to allow inclusion of these populations as a whole, which the state has disclosed that ACCESS was different from traditional Medicaid across three dimensions. And to this ---- This stuff doesn't read easily, so maybe I'm just going to take a while, and I'll study this again after the argument. But as I look at waiver 12 on ER-165, it makes specific reference to the composition of the non-Federal share of Medicaid expenses. And how is that going to play out? Is that something that refers to the part that the Federal Government, the population the Federal Government doesn't perceive as being eligible for Medicare, Medicaid? Well, Your Honor, to answer that question, I think we need to look at the way that the phrase medical assistance is used throughout Title 19. And again, Medicaid is not used in Title 19. It's not a defined term. The statute that we are contemplating today is the Medicare statute that says that you have to pay hospitals on account of their treatment of low-income populations eligible for medical assistance under a state plan approved under Title 19. And if you look throughout the body of Title 19, and I'm just going to use today the statutes that the Secretary has relied upon in her briefing, to prove the point. First, let's take a look at 1396A, subsection A-2. The statutes that the Secretary has relied upon in her briefing, to prove the point. A state plan must, quote, provide for distribution of medical assistance funds from Federal or State sources. Medical assistance may be provided by either or. It's not an and. Both are not required. Two, 1396A, subsection A-2 provides for some parity of benefits languages among the categorically eligible populations. The medically needy, medically indigent populations that are articulated in Title 19, and certain optionally eligible populations. And I know it's confusing with this, you know, all these populations, but these are the three that Title 19 sets forth, which, again, it bears emphasis, all of the populations disputed in this case could have been included under those had Arizona elected to draw down Federal financial participation. Arizona chose not to. But anyways, these parity of benefits statutes between, at 1396A, 10A-C, establish that you can have medical assistance provided by a state for the populations identified in Title 19, as well as other populations identified by the state. Again, at no point do these statutes require medical assistance to be funded by both Federal or State sources. They require Federal and State dollars for specific eligibility categories. Perhaps another convincing piece of evidence on this is Congress' language in 1396B, sub F, limitation on Federal participation in medical assistance. And this is the statute where Congress prohibits a Federal grant of monies to a state for medical assistance payments made on behalf of persons who exceed the categorical optional or medically needy populations described in Title 19. But this statute in and of itself, Congress is acknowledging that a state can pay medical assistance without Federal contribution for populations other than those three categorically eligible groups. And unless the Court has additional questions, I'd like to reserve the balance of my time. And, well, this is a tough slog, and we need your help, so we'll give you the three minutes you asked for to begin with. Thank you. May it please the Court. I'm August Flangey with the Justice Department here on behalf of the government. I think one thing is very critical in this case, and that's assessing whether this access program as a whole is a Medicaid state plan. And if we look at the documents submitted in 1982 and in the intervening years, it's clear that the Secretary did not create any new eligibility waiver for these state-funded groups. This is also supported fully by Arizona law and its own pronouncements about how access works. Arizona law is very clear in Section 362903.06 that Medicaid dollars can only go to the Medicaid-eligible group. It cannot go to these three state-funded groups, which are funded with 100% state funds. Access itself, one example in supplemental excerpts of Record 77, talks specifically about the two different groups, the Medicaid-eligible groups, and then the other groups that are state-funded groups. So while access is a kind of an umbrella managed care system for providing care to the Medicaid-eligible population of Arizona, it also provided benefits to other people who are not Medicaid-eligible. It even provided benefits, it even made eligible state employees and some private employees who undoubtedly would not help serve the purpose of the Medicaid fraction of the dish. Could these people have been made eligible for Medicaid? I don't think we know that. I think that Arizona in the late 90s created a Portland Adventist-type expansion population that covered these. That was under a waiver. But the important thing is, until that happened, the Secretary just did not review these groups to make that sort of a determination, whether they could be eligible or whether a demonstration project would further the interests of the Medicaid statute. And that's an important element of this. Congress used this kind of wordy phrase to get at Medicaid eligibility in designing the dish, and when Congress did that in 1986, it was perfectly aware that Medicaid programs in different states work differently. Some states cover a smaller group of people, some states cover categorical and optional groups. So Congress was aware of that, but used the dish, Medicaid eligibility in the dish, to define the group that would be in this group. And so it's undoubtable that it's pretty clear that in using Medicaid eligibility, Congress did not intend the dish, the Medicare dish, to count every low-income person that receives care in a hospital. There's very significant groups who just cannot be eligible for a traditional Medicaid plan. The most notable example is single adults who are not eligible for Medicaid. Single adults, you know, even a low-income single adult is not going to be eligible under a traditional Medicaid plan. So when Congress designed the dish, it knew that there were large groups of people, and that's part of who this Arizona Access group program covers, that are not within these, even the optionally eligible groups in the Medicaid statute. And if you're opposing counsel says that the term Medicaid is not used anywhere. Now, if you're opposing counsel says that the term Medicaid is not used anywhere, do we have a firm definition of what Medicaid is? Well, I mean, Congress doesn't use the word Medicaid, but it uses this phrase in the Medicare dish a lot, around 50 times in the Social Security Act, and that's sort of what Congress says when it's trying to define who is eligible for Medicaid. Patients who were eligible for medical assistance, which is a term that's defined in the Medicaid Act to mean the federal financial participation, under a state plan approved under Subchapter 19. Now, the other side has been very upfront. These patients do not have any federal financial participation. That is a key part of that definition, and it's really, if you're thinking about how do you define what a Medicaid beneficiary is, the way you think about it is it's someone who's getting their care with some of the federal-state cooperative payment for services. And in this case, the only people getting that federal financial participation is the group of Medicaid-eligible, the ones that were counted in the Medicare dish, not the other groups that they were litigating over. And one concern, if you ---- Is there one element which distinguishes a Medicaid-eligible from the other groups that are given state funds? Is there one specific, like, characteristic other than income? Are they all married? Are they working? You know, I don't know exactly. I think the Arizona Access pretty much bases eligibility only on income. And, in fact, it covers state or private employees if they want to get into the program. So it's really a big difference. The Access defines the Medicaid-eligible group by just referring to the Medicaid-eligible group. It's the people who are eligible under the state plan. So you'd have to look. We put the old state plan in our supplemental record excerpts at about page 40, and it goes through all of the different groups where Arizona checks a box to say these people are eligible for Medicaid. So it would be those groups in those pages of the excerpts. It's a little bit impenetrable, but if you compare that to the waiver that the other side spoke of, which is at the Excerpts of Records I believe 165 in the supplemental excerpts, page 18, that talks about waiving certain kind of Medicaid limitations, but it does not create any new eligibility groups. And, Judge Clifton, you were correct. The Waiver 12 spoke to how the funds, how the government's Medicaid funds could be spent, I mean, excuse me, how state and local funds could be spent as the state part of paying for, quote, Medicaid expenses. So it wasn't talking about anything with respect to how to pay for these non-eligible groups. I do want to point out that a couple of the hospital's arguments address them quickly. The other side has talked about how this case is fit into the reasoning of Portland Adventist. There, again, you had a specific demonstration project approval by the Secretary of the groups that were being covered and that the parties were litigating over whether they qualified as eligible. Here you have a group that is one step further removed from the Medicaid program. It's a group that the Secretary did not look at and assess whether they would be qualified by a demonstration project. And without that sort of approval by the Secretary, the federal government just does not have an interest in how that, how the program works. It doesn't assess that, and there should be at least that sort of federal involvement, and including the federal financial participation in the care, before they could qualify under the DISH provision. If there are no further questions, I'll rest and concur. The relevance of this whole harmless provision. Sure. In the 1990s, some fiscal intermediaries were including a variety of general assistance and state-funded groups in calculating the Medicare DISH. They were doing that erroneously. So in the late 90s, the federal government decided that the Medicare DISH program was not going to work. And the Secretary had to find a way to solve this interpretive problem. And the Secretary did not want to take money away from these low-income hospitals that were already relying on it. So established this whole harmless policy. Now, there wasn't this kind of reliance in Arizona. In Arizona, the record shows clearly that in 1990, the, between 1990 and 1992, it was written at ER, at the excerpts of record page 221, all Arizona hospitals were advised that these access state groups were not to be included in the DISH calculation. So the hospitals would have been aware in Arizona, and so they wouldn't have relied incorrectly on that policy during the 90s in the periods at issue here. In addition, the hospitals here, the whole harmless policy also included hospitals that had specifically raised the issue in an appeal, in a timely appeal. As of the time the policy was issued, these hospitals had not raised that issue. And that makes sense, because they understood since the early 90s that these groups were not covered. So the whole harmless policy doesn't apply in this case. And we have, you know, a decision of the administrator that should get abuse of discretion review on that issue, and the district court both carefully looked at that issue and concluded there was no entitlement to hold harmless. If there are no further questions, the district court's opinion, analyze these issues carefully, is well-reasoned, and I encourage this Court to affirm. Ms. Davis? Yes, a few points. The district court did analyze these issues, and the district court agreed with the hospital's position on every point, except for the court's collateral attack on the Secretary's 1982 approval of Arizona's waiver application. Had the court not gone in and covered the issue, and carved out these eligibility groups that are the subject of this dispute, the outcome would have been different, and we wouldn't be here today. The district court would have directed the Secretary to include those patients, because they were included as part of Arizona's approved state plan, which under this Court's holding in Portland, required them to be considered eligible for inclusion under the Medicare DISH statute. I would like to point out that opposing counsel has pointed you in his statements to certain stipulations made at the PRRB level, and if you look at those stipulations, which are on page 220 of the excerpts of record, the Secretary and, or the Secretary's agent, the intermediary, and the hospitals agreed that the MNMI, ELIC, and EAC categories are all categories of medical assistance, and that they are not eligible for medical assistance under ACCESS. They also agreed that, pursuant to the waiver, ACCESS is Arizona's state plan. There's also agreement that the Secretary approved all programs included in Arizona's state plan, including these eligibility categories, which were clearly described throughout. For instance, if you look at excerpt of record, page 162, there's a chart showing the demographics and the eligibility categories down to the number that was disclosed to the Secretary in 1982. Also, stipulations that the Secretary approved all programs included in Arizona's state plan, and if you look at excerpt of record, page 162, and section number 15, the Secretary admits and stipulates that these MNMI, ELIC, and EAC are all categories of medical assistance that could have been included under traditional Medicaid. In the trial proceeding below, the Secretary admitted that Arizona submitted a comprehensive written commitment to administer the Medicaid program through ACCESS when it submitted its waiver application in 1982. The Secretary further added that Arizona's overall commitment to provide comprehensive medical assistance to low-income patients, including MNMI populations. The Secretary admitted these or failed to dispute them in response to the hospital's statement of facts. The trial court below overlooked these admissions in reaching his conclusion and overlooked the balance of the evidence submitted in Arizona's 1982 waiver application. Council has also quoted to certain Arizona laws that were enacted years after Arizona submitted its waiver approval. If you look at the law in effect in Arizona at the time that it submitted its waiver application, Arizona revised statute section 3629030 from 1981, which was the enabling legislation in the state, the director of the Arizona Department of Health Services shall apply for and accept federal funds available under Title XIX in support of ACCESS, the program. I would also point out that the Secretary has agreed with the hospital's position in this case that medical assistance means payment by the state, and that federal financial participation is not essential to something being considered medical assistance in this case. In response to the petition for Circe Aurore in the Adena case, in that response... Don't launch into a new point here. You have more than a minute over. Do you have any final comment? My final comment is that the hospitals are not asking this court to deviate or extend from its ruling in Portland. The law in Portland is still sound. And what that court held is that any population approved as part of a state plan by virtue of an 1115 waiver must, by definition, be included in the Medicare DISH low-income proxy. The district court agreed with that proposition, and based on that formulation, all that needs to be decided is whether these populations were included as part of Arizona's original state plan waiver, which the weight of the evidence in the Secretary's admissions all agree that they were. We thank you. We thank both counsels for your arguments in this difficult case. The calendar for today is concluded, and we are in recess.
judges: Fletcher B. , Clifton, Bea